# EXHIBIT 4

EXHIBIT

A - 1

PRE – INCORPORATION AGREEMENT

BETWEEN

CONTROL DATA CAPITAL CORPORATION

AND

MARCELLUS L. JACOBS AND PAUL R. JACOBS

FOR THE FORMATION OF

JACOBS WIND ELECTRIC COMPANY

APRIL 18, 1980

I N D E X

Pre-Incorporation Agreement                                          1

Exhibit A - Certificate of Incorporation                            2

Exhibit B - Resolutions of Incorporator                             3

Exhibit C - Bylaws                                                  4

Exhibit D - Subscription Agreement - Control Data Capital
            Corporation                                             5

Exhibit E - Convertible Debenture                                   6

Exhibit F - Subscription Agreement - M.L. Jacobs and P.R. Jacobs    7

Exhibit G - Secured Corporate Debenture                             8

Exhibit H - Security Agreement                                      9

Exhibit I - List of Materials to be Transferred                    10

Exhibit J - Terms of Sale of Preproduction Models                  11

Exhibit K - Promissory Note                                        12

Exhibit L - Trademarks and Tradename                               13

Exhibit M - Professional Services Agreement                        14

Bill of Sale - Control Data Corporation to Jacobs Wind
            Electric Company                                       15

Bill of Sale - Jacobs Wind Electric Company, Inc., M.L. Jacobs
            and P.R. Jacobs to Jacobs Wind Electric Company        16

Receipt for Control Data Capital Corporation Check in the
            Amount of $200,000                                     17

Letter of Understanding Concerning Pre-Incorporation
            Professional Expenses                                  18

SBA Form 1031 - Portfolio Financing Report                         19

SBA Form 480 - Size Status Declaration                             20

SBA Form 652D - Assurance of Compliance                            21

Photocopy of Certificate for 145,000 Shares of Common
            Stock of Jacobs Wind Electric Company Issued
            to Control Data Capital Corporation                    22

## PRE-INCORPORATION AGREEMENT

THIS AGREEMENT, is entered into as of this 18th day of April, 1980, by and between

CONTROL DATA CAPITAL CORPORATION, a Delaware corporation having its principal place of business at 8100 Thirty-Fourth Avenue South, Post Office Box 0, Minneapolis, Minnesota 55440 ("CDCC"),

and

MARCELLUS L. JACOBS and PAUL R. JACOBS, individuals having a place of business at Route 13, Box 722, Fort Myers, Florida 33908 (collectively the "Jacobs").

### WITNESSETH:

WHEREAS, CDCC and the Jacobs desire to incorporate a new business to be known as Jacobs Wind Electric Company (the "Company") for the purpose of designing, manufacturing and marketing wind-powered electric generators; and

WHEREAS, CDCC and the Jacobs desire to set forth the terms and conditions of the incorporation of, their investment in and the management of the Company;

NOW, THEREFORE, the parties hereto represent, warrant, covenant and agree as follows:

ARTICLE ONE

INCORPORATION

1.1  The incorporator of the Company shall be a person acceptable to each of the parties who will cause to be filed with the Secretary of State of the State of Delaware a Certificate of Incorporation substantially in the form of that attached hereto as Exhibit A.

1.2  The parties hereto shall use their best efforts to cause the incorporator of the Company to expeditiously adopt the resolutions attached hereto as Exhibit B and to adopt as the Bylaws of the Company the form of Bylaws attached hereto as Exhibit C.

ARTICLE TWO

CAPITAL CONTRIBUTIONS

2.1  Concurrently with the signature of this Agreement, CDCC shall subscribe for and offer to purchase, pursuant to a Subscription Agreement substantially in the form of that attached hereto as Exhibit D, one hundred forty-five thousand (145,000) shares of the Common Stock of the Company for an aggregate purchase price of one hundred forty-five thousand dollars ($145,000) in cash and a Convertible Debenture substantially in the form of the that attached hereto as Exhibit E in the principal amount of fifty-five thousand dollars ($55,000) for a purchase price of such principal amount in cash.

2

2.2 Concurrently with the signature of this Agreement, the Jacobs shall subscribe for and offer to purchase, pursuant to a Subscription Agreement substantially in the form of that attached hereto as Exhibit F, one hundred fifty-five thousand (155,000) shares of the Common Stock of the Company in consideration of the assignment to the Company of all United States and foreign patents, patent applications and related technical knowledge and similar rights and certain other items currently owned or controlled by the Jacobs and which relate to wind energy systems (all of which are described in the attachments to Exhibit F and are hereinafter collectively referred to as the "Assigned Rights").

2.3 The parties hereto will use their best efforts to cause the directors of the Company, to expeditiously accept the Subscription Agreements referred to in paragraphs 2.1 and 2.2 above.

2.4 The parties hereto shall cause the Company upon acceptance of the subscriptions of the parties, in additional consideration of the assignment referred to in paragraph 2.2 above and in addition to the payment of twenty-five thousand dollars referred to in paragraph 3.1 below, to issue to M. L. Jacobs a Debenture or Debentures substantially in the form of that attached hereto as Exhibit G, in the aggregate principal amount of two hundred ninety thousand dollars ($290,000). Simultaneously with the issuance of such Debenture or Debentures the Company shall execute and deliver to M. L. Jacobs a Security Agreement substantially in the form of that attached hereto as Exhibit H, granting

3

to M. L. Jacobs a security interest in the Assigned Rights and other items to secure payment of all amounts due pursuant to such Debenture or Debentures.

2.5  The parties hereto shall cause the Company, in additional consideration of the assignment referred to in paragraph 2.2 above, upon acceptance of the subscriptions of the parties, to pay to M. L. Jacobs the sum of fifty thousand dollars ($50,000) in cash.

2.6  It is the intent of the parties hereto that the transactions set forth in Articles One and Two of this Agreement constitute a tax-free exchange pursuant to Section 351 of the Internal Revenue Code of 1954, as amended, (26 U.S.C. 351) and each of the parties agrees to use his or its best efforts to carry out such transactions so as to qualify for the tax-free treatment accorded by that section.

ARTICLE THREE

CERTAIN TRANSACTIONS

3.1  The Jacobs entered into a Statement of Understanding on April 25, 1979 (the "Statement of Understanding") with Control Data Corporation, 8100 Thirty-Fourth Avenue South, Minneapolis, Minnesota ("CDC") pursuant to which, among other things, CDC was granted an option to purchase all of Jacobs patents and patent applications relating to wind energy systems.  CDC paid to

4

M. L. Jacobs the sum of twenty-five thousand dollars ($25,000) in consideration for such option and the Statement of Understanding provided that the amount of such payment be applied toward any purchase of such patent rights.  By signature of this Agreement CDC hereby assigns and transfers to the Company whatever rights it may have to purchase from the Jacobs all patents, patent applications and related technical knowledge held by them which relate to wind energy systems.  The parties and CDC hereby agree that this Agreement supersedes the Statement of Understanding and that all rights and obligations of the parties to the Statement of Understanding are merged into this Agreement.

3.2  As foreseen in the Statement of Understanding, CDC has advanced to the Jacobs certain funds for the purchase of parts and subassemblies to be used in the manufacture of wind energy systems.  As of the date of this Agreement CDC has advanced the sum of one hundred sixty thousand dollars ($160,000) to a bank account in the name of M. L. Jacobs.  The Jacobs, through Jacobs Wind Electric Company, Inc., a Florida corporation of which they own all of the stock ("Jacobs Florida"), have purchased or com-mitted to purchase parts and subassemblies having an aggregate purchase price of two hundred six thousand eight hundred eight-six dollars ($206,886) pursuant to the purchase orders listed in Exhibit I, attached hereto.  Any portion of the funds advanced by CDC remaining on unexpended for parts and subassemblies as of the date hereof, together with any interest earned thereon, shall, as soon as practicable after formation of the Company, be transferred by the Jacobs to the Company.

5

3.3  CDC hereby agrees, upon organization of the Company, to advance to the Company in cash the sum of forty thousand dollars ($40,000) to be used for general working capital purposes.

3.4  CDC has purchased or committed to purchase parts and subassemblies to be used in the manufacture of wind energy systems having an aggregate purchase price of seventy thousand two hundred nineteen dollars ($70,219) pursuant to the purchase orders listed in Exhibit I, attached hereto.  CDC has, as of the date hereof, paid for such parts and subassemblies the amount of fifteen thousand nine hundred forty dollars ($15,940).

3.5  Concurrently with the signature of this Agreement the Jacobs and Jacobs Florida and CDC shall execute and deliver to the Company bills of sale for the parts and subassemblies covered by the purchase orders copies of which are contained in Exhibit I. The Company does hereby agree to assume all of the obligations of the Jacobs, Jacobs Florida and CDC under such purchace orders and to indemnify and hold the Jacobs, Jacobs Florida and CDC harmless from any loss, liability or expense arising out of or related to such purchase orders.

3.5  The Jacobs have entered into a lease agreement dated April 8, 1980 on behalf of the Company for certain office and manufacturing space located in Plymouth, Minnesota.  The Company does hereby agree to indemnify and hold the Jacobs and Jacobs Florida harmless from any loss, liability or expense arising out of or related to such lease.

6

3.7   In consideration of the assignment and transfer by CDC of its rights concerning the Jacobs' patents and patent applications as set forth in paragraph 3.1, and in consideration of the amounts advanced or to be advanced by CDC pursuant to paragraphs 3.2, 3.3, and 3.4 the parties shall cause the Company to issue to CDC, immediately following organization of the Company, its promissory note in the form of that set forth in Exhibit K and in the principal amount of two hundred forty thousand nine hundred forty dollars ($240,940).

3.8   Concurrently with the signature of this Agreement, the Jacobs will cause Jacobs Florida to execute an assignment to the Company of all its right, title and interest in the trademarks and trade names listed in Exhibit L (the "Trademarks").   In consideration of such assignment, the parties shall cause the Company to pay to Jacobs Florida the sum of ten thousand dollars ($10,000) as soon as practicable after organization of the Company.

3.9   CDC has commenced the assembly of ten (10) preproduction wind energy systems.   CDC agrees that it will complete the assembly of such systems as soon as reasonably possible and will transfer title of the systems to the Company upon such completion.   It is understood that CDC will utilize in order assembly parts and subassemblies covered by the purchase orders listed in Exhibit I.   It is further understood that CDC will complete such assembly on the premises of the Company and that CDC will require the assistance of the Company's manual workers, the reasonable cost of which shall be reimbursed to the Company

7

by CDC. Any additional parts and subassemblies required for such preproduction systems will be paid for by CDC. The transfer of such completed systems to the Company will be subject to the terms of Exhibit J hereto. Such transfer will be without further consideration to CDC.

ARTICLE FOUR

REPRESENTATIONS AND WARRANTIES OF THE JACOBS

4.1 The Jacobs represent and warrant that they are individuals resident in the state of Florida and that they have no residence in any state other than Florida.

4.2 The Jacobs represent and warrant that they individually or collectively have good and marketable title to the Assigned Rights free and clear of any mortgage, lien, pledge, charge, claim or encumbrance and that they have granted no license or right to acquire a license under any of the Assigned Rights except to CDC pursuant to the Statement of Understanding.

4.3 The Jacobs represent and warrant that Jacobs Florida has good and marketable title to the Trademarks free and clear of any mortgage, lien, pledge, charge, claim or encumbrance and that it has granted no license or right to acquire a license covering the Trademarks.

4.4 The Jacobs represent and warrant that at the time of signature of this Agreement they have no knowledge of any allegation,

8

claim or litigation to the effect that the patents described in the attachments to Exhibit F are not valid or enforceable or to the effect that the wind energy systems previously built by the Jacobs or Jacobs Florida or any predecessor companies infringe on the patent or other intellectual property rights of any third parties.

4.5  The Jacobs represent and warrant that the assignments set forth in Exhibit F and the assignment to be executed pursuant to paragraph 3.6 cover or will cover all patents, patent applications and related technical knowledge, trademarks, trade-names and similar rights now owned, individually or collectively, by the Jacobs and Jacobs Florida and which relate to wind energy systems.

4.6  The Jacobs warrant that there are no actions, suits, or proceedings pending or, to their knowledge, threatened against them or any property owned or controlled by them and which is subject to this Agreement nor is there any condition or event, current or anticipated, known to them which would prevent them from performing all of their obligations under this Agreement or any related agreement.


ARTICLE 5

FURTHER INVESTMENT

5.1  The parties hereto mutually acknowledge that they understand that the Company will be unable to continue its operations unless

9

substantial additional capital is invested in the Company in the near future. They further acknowledge that no party hereto or any related party has made any representation that it will invest any funds in the Company except as expressly required by the terms of this Agreement and that no party hereto or any related party has any obligation to provide any such further funds. The provision of further funds in the future by any party hereto or any related party shall not be construed as an undertaking to continue to provide such funds unless otherwise agreed in writing.

5.2 Each of the parties hereto agrees to use reasonable efforts to obtain additional investments in the Company in the amount needed to continue its operations in accordance with current plans. Each party agrees that all of its efforts to obtain additional investments in the Company will be made in strict compliance with all applicable federal and state laws and in particular those regulating the sale of securities. Without limiting the foregoing, all efforts to sell any securities of the Company will be made in strict compliance with Rule 146 of the General Rules and Regulations issued by the Securities and Exchange Commission under the Securities Act of 1933, as amended. No party hereto shall have any obligation to any other party to reimburse such other party for any losses or damages which may be incurred by such party as a result of insufficient further capital being obtained.

10

EXHIBIT

A - 2

## ARTICLE SIX

### MANAGEMENT OF THE COMPANY

6.1 The parties agree that for a period of two years from the date of signature of this Agreement they shall use their best efforts to cause:

(a)  The Bylaws of the Company to provide for an authorized Board of Directors of not more than three (3) members;

(b)  At all times at least one (1) director of the Company to be a person designated by CDCC (the "CDCC Designee") and two (2) directors to be persons designated by the Jacobs (the "Jacobs Designees");

(c)  Any vacancy created by the death, resignation or any other event affecting a CDCC Designee to be filled by another person designated by CDCC and any vacancy created by the death, resignation or any other event affecting a Jacobs Designee to be filled by another person designated by the Jacobs;

(d)  The Company to provide to each director designated by the parties written notice and an agenda of all meetings of its Board of Directors at least fifteen (15) days prior thereto and to promptly provide to each such director a copy of the minutes of all meetings of the Board of Directors and all other actions and other reports of or given to the Board of Directors or any committee thereof;

11

(e)   The Company, so long as any person designated by CDCC or the Jacobs is a member of its Board of Directors, to maintain in its Bylaws a provision indemnifying each of its directors to the fullest extent permitted by applicable law against all claims, losses, damages and expenses to which any such director may be subjected as a consequence of or in any way arising  out of such director's service or status as a member of such Board of Directors.

The parties shall designate the persons whom they desire to be elected to the Board of Directors of the Company by means of a written notification addressed as provided in paragraph 10.6 below.

6.2 The parties hereto agree that, so long as both CDCC and either of the Jacobs shall hold any common stock of the Company they shall use their best efforts to cause the Company, and by acceptance hereof the Company agrees during such period:

(a)   To furnish to each of the parties as soon as available, and in any event within seventy-five (75) days after the close of each fiscal year, a balance sheet of the Company as of the close of such fiscal year and consolidated statements of income and retained earnings and changes in financial position for the year then ended, prepared in conformity with the informational requirements of each of the parties and with generally accepted accounting principles, applied on a basis consistent with that of the preceding year or containing disclosure of the effect on financial position or

12

results of operations of any change in the application of accounting principles during the year, and accompanied by a report thereon containing an opinion of the Company's independent certified public accountants;

(b)  To deliver to each of the parties within twenty (20) days following the last day of each calendar month:  (1) separate balance sheets of the Company and each of its sub-sidiaries as of the close of each month and statements of income and retained earnings for that portion of the current fiscal year then ended, prepared in conformity with the informational requirements of the parties and with generally accepted accounting principles, applied on a basis consistent with that of the preceding period or containing disclosure of the effect on the financial position or results of operations of any change in the application of generally accepted accounting principles during the period, and reported on by an authorized financial officer of the Company; (2) a written statement by an authorized financial officer of the Company that there existed on the last day of such accounting period no condition or event which constitutes a default in the observance, performance and fulfillment of any of the covenants, agreements or conditions contained in this Agreement; and (3) a monthly aging report of its accounts receivable and accounts payable;

(c)  To deliver to each of the parties within ten (10) days after the Company's issuance or receipt thereof copies of

13

(1) all reports submitted to the Company by its certified public accountants that contain an opinion rendered in connection with an examination of any financial statements of the Company by such accountants; the preliminary prospectus and the effective prospectus contained in any registration statements filed with the Securities and Exchange Commission, and any amendments thereto; any annual or periodic report filed with such Commission; and any listing application filed with any stock exchange; and (2) each annual report and all other reports, including proxy solicitations, which the Company shall from time to time send to its shareholders;

(d)   To prepare and submit to its Board of Directors at least three months prior to the beginning of each fiscal year a draft of an annual plan and budget for such year which shall include monthly capital and operating expense budgets, cash flow statements and profit and loss projections itemized in reasonable detail; the final draft of such annual plan to be presented to the Board of Directors for approval at least one month prior to the beginning of each fiscal year of the Company;

(e)   To permit, at such reasonable times as will not unreasonably interfere with the conduct of its business, any of the parties or their officers, employees or designated representatives to visit and inspect any property of the Company and to make available for inspection or copying any of the Company's books and records.

14

6.3 The parties hereto agree that, so long as both CDCC and either of the Jacobs shall hold any common stock of the Company, they shall use their best efforts to cause the Company and its subsidiaries not to, and the Company by acceptance hereof agrees that the Company and its subsidiaries will not during such period, without the written permission of each of the parties:

(a) Substantially change the present or now intended nature of their business operations;

(b) Create, issue, sell or modify any class of capital stock, stock warrants, rights or options, nor directly or indirectly purchase, acquire redeem or retire any shares of capital stock outstanding, nor pay any dividends except dividends paid by a subsidiary to the Company;

(c) Pay any profit-sharing bonus to any employee except pursuant to a formal written plan previously approved in writing by each of the parties;

(d) Establish or increase the compensation of any officer, director or any person owning beneficially five percent (5%) or more of the outstanding common stock of the Company, or of the spouse or any other member of the family of such officer, director or beneficial owner, except as may be approved by a majority of the entire Board of Directors from time to time, including the affirmative votes of a CDCC Designee and a Jacobs Designee if any such persons are then serving on the

15

Board of Directors of the Company; as used herein, the term "compensation" shall include all salaries, payments or contribution to pension or profit sharing programs, directors' fees, commissions, retainers, drawing accounts, loans and advances and other payments, whether direct or indirect, in money or otherwise, for personal services performed for the Company;

(e)  Invest in, lend or advance funds to an individual or other corporation or business entity, except to a wholly-owned subsidiary of the Company, it being the intent of this Agreement that the Company and its subsidiaries will devote their full capital and resources to their own corporate business and purposes;

(f)  Consolidate or merge with or purchase all or a substantial part of the assets of any corporation, firm, association or enterprise, or sell, lease or otherwise transfer any of the Company's assets other than in the normal course of its present business or enter into any franchising agreement;

(g)  Incur any indebtedness nor enter into any leasing or similar contractual relationship, or allow to exist any mortgage, pledge, lien or other encumbrance of any kind on any of its properties nor to acquire or agree to acquire any property under any conditional sales agreement or title retention contract except as may be approved by a majority of the Board of Directors from time to time, including the

16

affirmative votes of a CDCC Designee and a Jacobs Designee if any such persons are then serving on the Board of Directors of the Company, and except for usual and customary open account indebtedness;

(h)  Guarantee or endorse any obligation of others or otherwise assume any contingent liability.

## ARTICLE SEVEN
### ADDITIONAL COVENANTS

7.1  The parties agree to cause the Company, immediately upon its incorporation, to enter into the Professional Services Agreement with Jacobs Florida attached hereto as Exhibit M and the Jacobs agree to cause Jacobs Florida to enter into such agreement.  The Jacobs agree that the compensation payable pursuant to such Professional Services Agreement or any substitute therefor shall not be increased for a period of two (2) years from the date hereof without the written permission of CDCC.

7.2   The Jacobs agree that, so long as CDCC owns five percent (5%) or more of the shares of the common stock of the Company from time to time outstanding and neither CDCC nor the Company are in material default of their obligations under this Agreement or any related agreement with the Jacobs or Jacobs Florida (other than a default occurring as a consequence of a willful act of one or both of the Jacobs):

17

(a)   They will cause Jacobs Florida to conduct no business of any kind related to wind energy systems except that contemplated under the terms of this Agreement and such business as may be provided for under subsequent agreements with the Company or CDCC; and

(b)   They will not engage, directly or indirectly, in the same or any similar line of business as that engaged in by the Company, either for their own account or as a partner or joint venturer, or as an officer, employee, agent or consultant of any firm or corporation;

provided, however, that the restrictions set forth in this paragraph shall terminate and cease to be of any further force and effect at such time as the Company shall cease or substantially cease doing business.

## ARTICLE EIGHT

### REGISTRATION OF COMMON STOCK

8.1  By acceptance of this Agreement the Company agrees that each time the Company shall determine to proceed with the preparation and filing of a registration statement under the Securities Act of 1933, as amended, (the "Act") or any successor to the Act, with respect to the sale of any of its securities (other than a registration statement on a form that does not permit inclusion of shares  to be sold by other than the issuer) the Company shall

18

give written notice of such determination to each of the parties to this Agreement which are at the time record holders of common stock of the Company acquired pursuant to this Agreement (the "Security Holders"). The Company shall, upon the written request of any Security Holder given within ten (10) days of receipt of any such notice from the Company, use its best efforts to register those shares of common stock of the Company acquired pursuant to this Agreement specified in such notice from any Security Holders (the "Shares") provided, however that:

(a)   the Company may at any time in its sole discretion abandon or delay any such registration;

(b)   if any such registration shall relate to an offering to be distributed by or through an underwriter chosen by the Company, the Company may require that the Shares be included in such underwriting on the same terms and conditions as the securities otherwise being sold through the underwriters and should the number of Shares exceed twenty-five percent (25%) of the total number of shares to be included in the proposed underwritten public offering and if in the good faith judgment of the managing underwriter of such public offering the inclusion of all of the Shares would reduce the amount of securities that could be sold in such public offering by the Company or interfere with the successful marketing of the securities to be so offered by the Company, then the number of Shares to be included in the underwritten public offering may be reduced by the managing underwriter except that in no

19

case shall the number of Shares included in the offering be reduced to less than twenty-five percent (25%) of the total number of shares included in such offering; those Shares excluded from such underwriting shall nevertheless be included in any such registration provided that the holders thereof shall agree in writing to withhold them from the market for such period, not exceeding ninety (90) days, which the managing underwriter reasonably determines is necessary in order to effect the underwritten public offering.

As used in this Article, registration under the 1933 Act shall include offerings made pursuant to the provisions of Regulation A under the 1933 Act.

8.2  If at any time after the Company has made any public offering of any of its securities, any party hereto requests the Company to effect registration of its common stock, other than as provided in Section 8.1, the Company will use its best efforts to effect the registration under the 1933 Act of such of the shares of its stock as it has been requested to register (the "Shares") and to effect compliance under applicable state laws in accordance with the methods of disposition described in the holder's request.  All expenses incurred in effecting any registration or compliance under this Section 8.2 shall be paid by the requesting party or parties.

8.3  If and when the Company is required by the provisions of this Article Eight to use its best efforts to effect the

EXHIBIT

A - 3

registration of any Shares under the 1933 Act, the Company will, as expeditiously as possible:

(a) Prepare and file with the Securities and Exchange Commission (the "Commission") a registration statement (including amendments and supplements thereto) and otherwise comply with the provisions of the 1933 Act with respect to the sale of such Shares and use its best efforts to cause such registration statement to become and remain effective for such period, not to exceed one hundred eighty (180) days, as may be necessary to effect the sale or other disposition of such Shares;

(b) Notify each selling Security Holder promptly of the time when any registration statement or post effective amendment thereto has become effective or any supplement to any prospectus forming part of any such registration statement has been filed;

(c) Notify each selling Security Holder promptly in the event that it receives notice or obtains knowledge of the issuance of a stop order by the Commission suspending the effectiveness of any such registration statement or the initiation or threat of any proceeding for that purpose, and promptly use its best efforts to prevent the issuance of a stop order and to obtain the withdrawal of any stop order issued;

21

(d)   Use its best efforts to register or qualify the Shares covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as any selling Security Holder shall reasonably request and do any and all other acts and things as may be necessary or advisable to enable such selling Security Holders to consummate the public sale or other disposition of the Shares;

(e)   Furnish to each selling Security Holder and any underwriter such number of copies of prospectuses, including preliminary prospectuses, in conformity with the requirements of the 1933 Act, and such other documents as may be reasonably be requested in order to facilitate the public sale or other disposition of the Shares;

(f)   Before filing any registration statement, or prospectus or amendments or supplements thereto, furnish to each selling Security Holder copies of all such documents proposed to be filed, which shall be subject to the approval of counsel for such holders; and

(g)   Furnish to each selling Security Holder a signed counterpart, addressed to such holder, of:

(i)   An opinion of counsel for the Company, dated the effective date of the registration statement; and

(ii)  A "comfort" letter signed by the independent public accountants who have certified the Company's

22

financial statements included in the registration statement,

covering substantially the same matters with respect to the registration statement (and the prospectus included therein) and (in the case of the accountants' letter) with respect to events subsequent to the date of the financial statements, as are customarily covered (at the time of such registration) in opinions of issuer's counsel and in accountants' letters delivered to underwriters in underwritten public offerings of securities.

8.4 The costs and expenses of registration, including legal fees, special audit fees, printing expenses, filing fees and premiums for insurance, if any, incurred by the Company in connection with any registration made pursuant to this Article Eight shall be borne entirely by the Company, except as set forth in paragraph 8.2.

8.5 The Company will indemnify each selling Security Holder, such holder's officers, directors, counsel, accountants and any controlling person thereof, and each underwriter of the Shares, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any prospectus, offering circular or other document (including any related registration statement, notification or the like) incident to any registration, qualification or compliance undertaken pursuant to this Article 8, or based on any omission (or

23

alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or any violation by the Company of any rule or regulation promulgated under the 1933 Act applicable to the Company and relating to action or inaction required of the Company in connection with any such registration, qualification or compliance, and will reimburse each such selling Security Holder and each underwriter for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action; provided that the Company will not be lible in any such case to the extent that any such claim, loss, damage or liability arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by an instrument duly executed by a selling Security Holder and intended for use with respect to any such registration, qualification or compliance.

8.6 In connection with any untrue statement (or alleged untrue statement) or omission (or alleged omission) made in any registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to the Company in an instrument duly executed by a selling Security Holder and intended for use therein, such selling Security Holder will, if Shares held by such selling Security Holder are included in the securities as to which such registration, qualification or compliance is being effected, indemnify the Company, each of its directors and officers who signs such a registration statement, each underwriter, if any, of

24

the Company's securities covered by such a registration statement, and each person, if any, who controls the Company within the meaning of the 1933 Act and each other selling Security Holder against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any such untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, offering circular or other document or any such omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company, such directors, officers, persons, underwriters or other selling Security Holders for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to the Company by an instrument duly executed by such selling Security Holder and intended to be specifically for use herein.

8.7 Each party entitled to indemnification under paragraphs 8.5 and 8.6 (the "indemnified party") shall give notice to the party required to provide indemnification (the "indemnifying party") promptly after such indemnified party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the

indemnifying party to assume the defense of any such claim or any litigation resulting therefrom; provided that counsel for the indemnifying party who shall conduct the defense of such claim or litigation shall be approved by the indemnified party (whose approval shall not be unreasonably withheld), and the indemnified party may participate in such defense at such party's expense and further provided, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under paragraph 8.5 and 8.6 hereof, except to the extent of any demonstrated prejudice for such failure to give notice. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

8.8 The Company shall not commit itself, by contract or otherwise, to grant to any party any rights to have any shares of the Company's common stock or any other equity security of the Company registered by the Company without the written permission of each of the parties to this Agreement which, at the time, are registered holders of common stock obtained pursuant to this Agreement.

## ARTICLE NINE

### RESTRICTIONS ON TRANSFER OF SHARES

9.1  CDCC agrees that it will not, without the prior written permission of the Jacobs, for a period of five years from the date hereof, sell or otherwise dispose of any shares of the common stock of the Company acquired by it pursuant to this Agreement.

## ARTICLE TEN

### MISCELLANEOUS PROVISIONS

10.1  <u>Survival of Representations and Warranties</u>.  The representations, warranties and agreements made respectively by CDCC and the Jacobs in this Agreement shall not be discharged but shall survive the consummation of the transaction contemplated hereby notwithstanding any inspection or investigation made with respect thereto.

10.2  <u>Indemnification</u>.  The Jacobs shall indemnify and hold harmless CDCC from and against any loss or damage which may be suffered by CDCC as a consequence of any breach by the Jacobs of any covenant, warranty, representation or obligation contained in this Agreement.  The Jacobs shall be liable in proportion to their interest hereunder with respect to any obligations to CDCC arising out of or in any way connected with this Agreement.  CDCC shall indemnify and hold harmless the Jacobs from and against any loss or damage which may be suffered by the Jacobs as

27

a consequence of any breach by CDCC of any covenant, warranty, representation or obligation contained in this Agreement.

10.3   Exhibits.   The Exhibits to this Agreement, identified by the letters of the alphabet running consecutively from A to M, inclusive, constitute an integral part of this Agreement and by this reference are incorporated herein in their entirety.

10.4   Successors and Assigns.   This Agreement shall be binding upon and shall inure to the benefit of the Jacobs and their respective successors and assigns and to the benefit of COCC and its successors and assigns; provided, however, that neither party shall assign this Agreement or any of its rights or obligations hereunder, in whole or in part, except upon the prior written consent of each of the other parties hereto.   Any prohibited assignment shall be null and void.

10.5   Governing Law.   This Agreement shall be construed and enforced in accordance with the laws of the State of Minnesota.

10.6   Addresses and Notices.   Any notice, request, instruction, designation or other document required or permitted to be given under this Agreement shall be in writing and shall be sufficiently given if delivered in person or deposited in the United States mail, postage prepaid, for mailing by certified or registered mail, as follows:

If to CDCC, delivered or addressed to:

    Control Data Capital Corporation
    8100 Thirty-Fourth Avenue South
    Post Office Box 0
    Minneapolis, Minnesota  55440
    Attention:  President

28

If to the Jacobs, delivered or addressed to:

    M. L. Jacobs and P. R. Jacobs
    Route 13
    Box 772
    Fort Myers, Florida  33908

or to such other address or addresses as may be specified from time to time by the parties.  Unless otherwise specified herein, a notice shall be effective as of the date delivered, or if given by mail, on the third (3rd) day subsequent to the date deposited for mailing.  Any such notice, request, instruction, designation or other document given by the Jacobs shall be valid if signed by either M. L. Jacobs or P. R. Jacobs (or by their respective successors or assigns) unless either of them shall have advised CDCC in writing that any such notice must be signed by both of them.

10.7  <u>Amendments</u>.  No amendments of any provision of this Agreement shall be valid or of any force or effect, unless made by an instrument in writing signed by an officer of CDCC and by each of the Jacobs.

10.8  <u>Entire Agreement</u>.  This Agreement and the Exhibits hereto constitute the entire agreement and understanding of the parties with respect to the matters herein set forth, and all prior negotiations and undertsanding relating to the subject of this Agreement are merged herein and are superseded by this Agreement.

10.9  Captions.  Sections headings as to the contents of par-
ticular sections are for convenience only and are in no way to be
construed as a part of this Agreement or as a limitation of the
scope of the particular sections to which they refer.

10.10  Company to be Bound.  The parties hereto agree to use
their best efforts to cause the Company to accept the provisions
of this Agreement which impose obligations on the Company.  Such
acceptance shall be accomplished by signature of any counterpart
of this Agreement by an authorized officer of the Company.

10.11  Parties.  Any reference herein to the parties to this
agreement shall refer only to the Jacobs and CDCC.

IN WITNESS WHEREOF, this instrument has been executed by a duly
authorized officer of CDCC and by the Jacobs as of the day and
year first above written.

CONTROL DATA CAPITAL
CORPORATION

By _____
Pre_ident

30

THE JACOBS

_____
M. L. Jacobs

_____
P. R. Jacobs

Signed for acceptance by Jacobs Wind Electric Company:

By _____          Date: _____4/18/80_____

Signed for agreement to the provisions of Article Three by
Control Data Corporation:

By _____          Date: _____4/18/80_____

31