UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Wind Turbine Industries Corp.,

       Plaintiff,

v.                             MEMORANDUM OPINION
                                     AND ORDER
                                     Civil No. 09-36 (MJD/SRN)

Jacobs Wind Electric Company, Inc.,

       Defendant.
_____

      William D. Schultz and John A. Clifford, Merchant & Gould, Counsel for Plaintiff.

      Jon Erik Kingstad and Scott A. Daniels, Counsel for Defendant.
_____

      Plaintiff Wind Turbine Industries Corp. ("Wind Turbine") brought this action in order to protect its rights in the "JACOBS" trademark.  Wind Turbine asserts that it and its predecessors in interest have used the JACOBS mark since 1979 in connection with the manufacture and sale of wind energy products. (Amended Complaint ¶ 6.)  Wind Turbine further asserts that Defendant Jacobs Wind Electric Company, Inc. ("Jacobs Wind") is wrongfully using, and has fraudulently obtained, a registration for the mark JACOBS WIND ENERGY SYSTEMS & Design (U.S. Registration No. 1,532,714 or the '714 Registration) and

is also wrongfully seeking registration of the mark JACOBS in connection with wind energy products (Application Serial No. 76/677,473 or the '473 Application). (Id.)

By Order dated March 23, 2010, this Court denied Jacobs Wind's motion for partial summary judgment, by which Jacobs Wind sought dismissal of Claim 2.  In Claim 2, Wind Turbine seeks an Order cancelling the '714 Registration and the '473 Application.  Currently before the Court is Wind Turbine's motion for partial summary judgment and Jacobs Wind's second motion for summary judgment.

## I.     Factual Background

Jacobs Wind was originally incorporated in Montana in 1928 by Marcellus Jacobs.  (Schultz Decl. [Doc. No. 45], Ex. 10 (Defendant's Reply to Interrogatories No. 1).)  Marcellus reincorporated Jacobs Wind as a Florida corporation in 1974. (Id.)  Jacobs Wind Electric Company (Delaware Corporation) ("Jacobs Delaware") was formed in 1980 by Marcellus, his son Paul Jacobs (the "Jacobs") and Control Data Capital Corporation ("CDCC") for the purpose of designing, manufacturing and marketing wind-powered electric generators.  (Id., Ex. 4 (Pre-Incorporation Agreement dated April 18, 1980).)

Prior to the formation of Jacobs Delaware, Jacobs Wind, the Jacobs and CDCC entered into a Statement of Understanding.  (Declaration of Paul Jacobs [Doc. 83], Ex. 1)   This Statement of Understanding set forth the terms of a proposal by which the Wind Electric Patents and other assets owned by the Jacobs would be sold to CDCC or a related subsidiary.  (Id.)  The proposal envisioned a one-year trial period during which Jacobs would assist CDCC in the production of ten preproduction units of the new Jacobs Wind Electric Plant as a means for CDCC to evaluate the product and the market for such product.  (Id.)

Following the trial period set forth in the Statement of Understanding, the parties executed the Pre-Incorporation Agreement, and Jacobs Delaware was incorporated for the purpose of designing, manufacturing and marketing wind-powered electric generators.  At that time, Jacobs Wind ceased to manufacture new wind energy products.  (Schultz Decl. [Doc. No. 45], Ex. 1 (Deposition of Paul Jacobs at 64).)  The Pre-Incorporation Agreement set forth the terms and conditions of incorporation as well as the investment in and the management of Jacobs Delaware.  (Id., Ex. 4.)

The Pre-Incorporation Agreement also provided that the Jacobs were to cause Jacobs Wind to assign to Jacobs Delaware "all its right, title and interest in

the trademarks and trade names listed in Exhibit L" and as consideration for this assignment, Jacobs Delaware agreed to pay Jacobs Wind the sum of $10,000. (<u>Id.</u>, Ex. 4 at ¶ 3.8.)  Exhibit L is a copy of U.S. Trademark Reg. No. 1,069,282 ('282 Registration) dated July 12, 1977 for a design mark (a picture of a wind turbine) and the trade name Jacobs Wind Electric Company.  (<u>Id.</u>, Ex. 5.)

Jacobs Wind and Jacobs Delaware also entered into a Professional Services Agreement whereby Jacobs Wind agreed to provide consulting services through M.L. and Paul Jacobs to Jacobs Delaware.  (<u>Id.</u>, Ex. 6.)  This agreement further provided that Jacobs Wind would not compete with Jacobs Delaware during the term of the agreement and for two years thereafter.  (<u>Id.</u>, at § V.)   In August 1982, Jacobs Delaware obtained U.S. Trademark Reg. No. 1,206,629 ('629 Registration) on the mark JACOBS.  (<u>Id.</u>, Ex. 2.)  This registration covered the JACOBS mark as used in connection with "wind electric plants, comprising wind-driven electric generators and parts thereof mounted upon metal towers and the like."  (<u>Id.</u>)  At some time later, Jacobs Delaware was renamed Earth Energy Systems, Inc. ("EESI").

On May 24, 1985, the Jacobs entered into an agreement with EESI entitled Termination of Pre-Incorporation Agreement.  (<u>Id.</u>, Ex. 7.)  By this agreement, the

4

parties to the 1980 Pre-Incorporation Agreement waived and terminated all rights

thereunder, and agreed that "the Pre-Incorporation Agreement shall be of no

further validity or effect as to him," except with regard to certain shareholder

registration rights.  (Id.)  Also on May 24, 1985, Jacobs Wind and EESI entered

into a new Professional Services Agreement, through which the Jacobs agreed to

provide professional consulting services to EESI.  (Id., Ex. 8 at § I.)   During the

term of this agreement, the Jacobs and Jacobs Wind agreed not to compete with

EESI, unless EESI provided approval.  (Id. § VI.)  This agreement further granted

to the Jacobs and Jacobs Wind

> the paid up license, in perpetuity, to continue using the trademarks
> registered in the U.S. Patent Office under Number 1,069,282 or variations
> thereof depicting any early 3 kw size Jacobs wind system with reference to
> the date 1935, and Number 1,206,629 for the word "Jacobs."  Jacobs, as a
> Florida corporation, has been using said trademarks or variations thereof
> since its earlier incorporation, and the sale in 1980 to [EESI] of the rights to
> the first mark did not specify that Jacobs must cease using the mark.  In the
> interim, [EESI] has been fully aware of the continued use by Jacobs of the
> marks and Jacobs letterhead as evidence by the monthly billings to [EESI]
> using Jacobs letterhead . . . The effect of this clause is to clarify this usage
> by Jacobs of the marks and letterhead and grant its continuance in
> perpetuity.  *Jacobs and the Individuals undertake and agree that such trademarks*
> *and letterhead will not be used by them in connection with the manufacture or sale*
> *of wind energy equipment nor will they be used in such a manner as to weaken*
> *their enforcement against their parties unless [EESI] shall no longer be engaged in*
> *the business of selling wind energy equipment.*

(Id. § IX) (emphasis added).  As the italicized language indicates, Jacobs Wind

agreed not to use the JACOBS mark in connection with the manufacture and/or

sale of wind energy equipment.

EESI purportedly began experiencing financial troubles by 1986.  (P. Jacobs

Decl. [Doc. No. 83] ¶ 41, Ex. 15.)  Paul Jacobs alleges that he met with the

President of EESI, R.W. Kleinert in May 1986, and learned that EESI was no

longer going to be engaged in the business of manufacturing and selling wind

energy systems.  (Id.)  Paul Jacobs further alleges that Kleinert informed him of a

consignment deal reached with Prior Lake Machine, which would address

service for 10-20 kw systems and to sell the rights to a demo 50 kw machine.  (Id.)

After learning of this information, Paul Jacobs was of the understanding that

Jacobs Wind would be in the position to use the JACOBS mark and the Jacobs

Wind Turbine logo (the '282 Registration) as EESI was no longer selling wind

energy equipment.  (Id. ¶ 42.)  Paul Jacobs wrote a letter to Kleinert in June 1986

letter, informing him of Jacobs Wind's intentions to reenter the sale and

manufacture of wind energy systems.  (Id. ¶ 43.)  Kleinert did not respond to the

letter. (Id.)

By agreement dated December 15, 1986, EESI sold to Wind Turbine, a company formed by Prior Lake Machine and its President Archie Pavek, all its rights, title and interest in the 50 and 10-20 kw wind energy systems for use in connection with the individual home and farm market.  (Schultz Decl. [Doc. No. 45] Ex. 9.)  EESI retained the perpetual, royalty-free, non-exclusive license to make, use and sell 10-20 kw systems for use in connection with wind farms.  (Id. at § 2.04.)  Attached to this agreement as Exhibit B is an assignment of trademark and service marks.  By this assignment, Wind Turbine and EESI agreed that EESI would "sell, assign, transfer and set over . . . the entire right, title and interest in and to the [JACOBS] mark[], together with the goodwill of the business . . . all subject to pre-existing licenses including licenses to Paul R. Jacobs and Jacobs Wind Electric Co., Inc., a Florida corporation . . . " to Wind Turbine, and that Wind Turbine would "grant[] back to [EESI] a license to use said JACOBS trademark in connection with commerce involving the goods listed in said Registration." (Id.)  The assignment of the JACOBS mark on record with the PTO provides that such assignment conveyed "the entire interest and the goodwill" of the mark JACOBS to Wind Turbine.  (Id., Ex. 3.)

Meanwhile, Jacobs Wind, Paul Jacobs and others (the "Jacobs Group")

7

intervened in an action brought in the Delaware Chancery Court by other

shareholders of EESI.  (P. Jacobs Decl.¶ 50 [Doc. No. 83].)  In that action, EESI and

the Control Data Corporation (collectively the "CDC Group") entered into a

settlement agreement with the Jacobs Group by which the CDC Group agreed to

purchase the Jacobs Group's shares of stock in EESI for $500,000 and agreed to

transfer certain assets to Jacobs Wind, including the CDC Group's right, title and

interest in the design of the wind turbine ('282 Registration) and the mark

MASTERMIND, U.S. PTO Reg. No. 1,340,154.  (Id. Ex. 21 (Settlement Agreement,

Ex. A).)  The settlement agreement further provided that the CDC Group would

use its best efforts to cause Wind Turbine to file an affidavit with the PTO that the

JACOBS mark was still in use to prevent automatic cancellation.  (Id.)  Further

the CDC Group agreed to use its best efforts to obtain for the Jacobs Group, from

Wind Turbine, a conditional assignment of the JACOBS mark ('629 Registration)

"so that if [Wind Turbine] abandons its use of the mark, the Jacobs Group will

become the sole owner of that mark."  (Id.)  The CDC Group also agreed "to

transfer and assign all of its right, title, and interest in the license retained by it to

the mark "Jacobs" in the [Wind Turbine] Agreement dated December 15, 1986,

subject to the prior written approval of [Wind Turbine] . . . and subject to the

sublicense by the Jacobs Group to the CDC Group of such mark for purposes of repair and reconstruction of WTG's in windparks presently owned and/or operated by the CDC Group . . ." (<u>Id.</u>)  EESI thereafter assigned its rights in the '282 Registration and the '154 Registration to Jacobs Winds.  (<u>Id.</u> Ex. 22.)

Around this time, 1988, Paul Jacobs asserts that he continued his efforts to resume commercial use of the Jacobs Wind trade names and marks by approaching Wind Turbine about a joint venture.  Wind Turbine did not accept this proposal. (<u>Id.</u> ¶ 61.)  Paul Jacobs further asserts that he later learned that Wind Turbine was misrepresenting itself as the successor to Jacobs Wind. (<u>Id.</u> ¶ 62.)  As indicated in a letter from Wind Turbine's counsel, Wind Turbine believed that it had an implied license to use the "Wind Turbine" logo that is covered in the '282 Registration.  (<u>Id.</u> ¶ 65, Ex. 30.)  Wind Turbine assured Jacobs Wind that it was trying to avoid being identified as the successor to Jacobs Wind.  (<u>Id.</u>)  Wind Turbine did agree to cease using the Wind Turbine logo.  (<u>Id.</u> ¶ 66, Ex. 31.)

In April 1989, Jacobs Wind obtained U.S. Registration No. 1,532,714 ('714 Registration) which covers a whale-tail design with the words JACOBS WIND ENERGY SYSTEMS contained within the tail fin.  (Schultz Decl. [Doc. No. 45], Ex. 15.)  The '714 Registration further provides that it covers the whale-tail design for

use in connection with "wind energy conversion apparatus comprising wind-driven generators for electrical and mechanical power generation and parts thereof mounted upon metal towers and the like." (Id.) Jacobs testified that in mid 1988, Jacobs Wind was approached to turn around existing wind farms, which would involve remanufacturing the equipment and servicing. (Id. Ex. 1 (Jacobs Dep. at 185-86).) The Jacobs sought this mark for use in their remanufacturing business, and the sale of the small, older 3-kw systems. (Id. at 185.) He further testified that Jacobs Wind had not manufactured any new tail fins during the last thirty years. (Id. at 35.)

Wind Turbine alleges that it has continuously used the JACOBS mark ('629 Registration) since it was acquired in 1986 and since that time, has been the only company producing JACOBS products. The PTO cancelled the '629 Registration as of May 31, 2003, however, because Wind Turbine inadvertently did not file the necessary renewal paperwork. (Daniels Decl. [Doc. No. 36], Ex. 1; Pavek Decl. ¶ 7.) Wind Turbine learned of the cancellation in late 2006 or early 2007. (Pavek Decl. ¶ 6). Wind Turbine thereafter applied to re-register its JACOBS mark. (Id. ¶ 9.) The application was refused, however, based on the mark shown in the '714 Registration. (Daniels Decl. [Doc. No. 36], Ex. 2.) On May 5, 2007, Jacobs Wind

filed an application for the JACOBS mark.  (Am. Comp. Ex. C.)  On the

application, the '714 Registration is listed as the prior registration.  (Id.)

## II.      Complaint and Counterclaim

In the Amended Complaint, Wind Turbine alleges that the '714

Registration was obtained fraudulently because Jacobs Wind knew it did not

have the right to use that mark in connection with the manufacture or sale of

wind energy equipment.  (Am. Comp. ¶ 18.)  Wind Turbine further alleges that

Paul Jacobs filed a declaration in support of this registration in which he stated

that Jacobs Wind believed itself to be the exclusive owner of the mark and that no

one else had the right to use the mark in commerce, despite his knowledge of

Wind Turbine's rights to the JACOBS mark, and the Jacobs' agreement not to use

the mark in connection with the manufacture or sale of new wind equipment.

(Id.)  Wind Turbine further alleges that the specimen of use filed in support of the

'714 Registration was a photograph of a generator fin not first sold by Jacobs

Wind, and a photograph cropped by Jacobs Wind to misrepresent the fact that

the product being installed was primarily not made by Jacobs Wind.  (Id. ¶¶ 19

and 20.)

With respect to the '473 Application for the JACOBS mark, Wind Turbine

asserts that pursuant to the May 24, 1985 agreement between EESI and Jacobs

Wind, Jacobs Wind had no right to use the JACOBS mark in connection with the

sale or manufacture of new wind energy equipment.  (Id. ¶ 22.)  Wind Turbine

thus asserts that the '473 Application is supported by fraudulent statements,

including the statement that Jacobs Wind believes itself to be the exclusive owner

of the JACOBS mark and that no else had the right to use the mark in commerce.

(Id. ¶ 23.)  Jacobs Wind knew that all rights to the JACOBS mark had been

assigned to Wind Turbine.  (Id. ¶ 25.)  Wind Turbine asserts that it competes

directly with Jacobs Wind and that Jacobs Wind seeks to trade off the goodwill of

Wind Turbine.  (Id. ¶ 28.)

Based on these allegations, Wind Turbine has asserted a number of claims,

including an unfair competition claim under federal and state law, trademark

infringement, deceptive trade practices and a claim to cancel the '714 Registration

and to order the Patent and Trademark Office to refuse to register the '473

Application.

In its Counterclaim, Jacobs Wind has also asserted a number of claims

under both federal and state law, including a claim to refuse to register Wind

Turbine's application for the JACOBS mark, false advertising, trademark

infringement, unfair competition, and violations of the Minnesota Consumer

Fraud Act and Minnesota Unlawful Trade Practices Act.  Jacobs Wind also seeks

declaratory relief that Wind Turbine did not acquire a valid right under

Minnesota law to the JACOBS mark.

By its motion for partial summary judgment, Wind Turbine seeks an Order

declaring that Wind Turbine has priority over Jacobs Wind to use the JACOBS

mark in connection with energy products; that Jacobs Wind has abandoned the

mark JACOBS WIND ENERGY SYSTEMS (and design) as used in connection

with the goods set forth in '714 Registration; and Jacobs Wind abandoned the

JACOBS mark as used in connection with the goods in the '473 Application.

Based on the findings of priority and abandonment, Wind Turbine also asks that

the Court cancel the '714 Registration and direct the PTO to refuse registration on

the '473 Application.

In its motion for summary judgment, Jacobs Wind seeks an Order

dismissing Wind Turbine's Amended Complaint in its entirety and entering

judgment in its favor on its counterclaims.

## III.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  This burden can be met "by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  The party opposing summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## IV.   Wind Turbine's Motion for Partial Summary Judgment

### A.   Priority

The exclusive right to use a mark belongs to the first person who appropriates it and uses it in connection with a particular business. Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc., 758 F. Supp. 512, 522 (E.D. Mo. 1991).  Ownership in a mark requires continuous use.  See Dept. of Parks and Rec. For State of Cal. v. Bazaar Del Mundo, Inc., 448 F.3d 1118, 1126

(9th Cir. 2006).

Wind Turbine asserts it has priority over Jacobs Wind to use the JACOBS mark ('629 Registration) in connection with wind energy products.  Jacobs Wind was subject to a non-compete agreement as of 1980 by which it agreed not to compete with Jacobs Delaware/EESI.  (Schultz Decl. [Doc. No. 45], Ex. 6 (Professional Services Agreement).)  As a result, Jacobs Wind did not engage in the manufacture, marketing or sale of new wind energy systems.  Because it was not involved in such activity, Jacobs Wind could not have been using the JACOBS mark. (Schultz Decl. [Doc. No. 77], Ex. B at 223:16-19.)  On the other hand, the record is clear that Jacobs Delaware/EESI, owner and registrant of the JACOBS mark, was using said mark in connection with the manufacture, marketing and sale of new wind energy systems, and that as of 1986, Wind Turbine had purchased all rights, title and interest in EESI's 50 and 10-20 kw systems, while granting a license to EESI to sell the 10-20 kw systems in connection with wind farms. (Answer [Doc. No. 16] Ex. 11 (December 15, 1986 Agreement).)  Further, there is no dispute that Wind Turbine used the JACOBS mark continuously in connection with the manufacture and sale of 10-20 kw systems in the home and farm markets. (Schultz Decl. [Doc. No. 77], Ex. F (Archie

15

Pavek Dep. at 172).)  Paul Jacobs testified that he was aware of no evidence that

Wind Turbine intended to abandon its use of the JACOBS mark.  (Id. at 210.)

Accordingly, Wind Turbine asserts that no reasonable jury could find that it did

not have priority to use JACOBS on wind energy products.

It is Jacobs Wind's position that it never sold its wind energy business to

Jacobs Delaware.  Rather, Jacobs Wind argues that it entered into a joint venture

with Control Data, and in the process created Jacobs Delaware and reserved the

rights and the goodwill to the JACOBS mark.  While Jacobs Delaware was a

separate corporation from Jacobs Wind, the principals of both were the same -

Marcellus and Paul Jacobs.  As such, Jacobs Wind asserts it was a full partner in

the joint venture for purposes of trademark use.

Jacobs Wind also argues that Wind Turbine was not assigned the entire

right, title and interest in the JACOBS mark or the goodwill of the business.

Rather, the assignment to Wind Turbine included a license back to EESI with no

further controls over the quality of products that EESI would produce.  Jacobs

Wind asserts that EESI relied on Jacobs Wind to maintain the quality of the goods

- a right and duty that was nonassignable under the May 24, 1985 Professional

Services Agreement.  As a result, Jacobs Wind asserts the assignment to Wind

Turbine was "in gross" and therefore null and void.  <u>See</u> 15 U.S.C. § 1060

(providing that a registered mark shall be assignable with the good will of the

business in which the mark is used).

An assignment in gross, which is sometimes referred to as a naked

assignment, is a transfer of a company's trademark apart from the goodwill of

the business.  <u>Black's Law Dictionary</u>, 128 (8th ed. 2004).  An assignment will not

be considered "in gross" where the assignee of the mark carries on substantially

similar business to that of the assignor, using the mark on similar goods.  <u>Main

Street Outfitters, Inc. v. Federated Dept. Stores</u>, 730 F. Supp. 289, 291 (D. Minn.

1989).

The record does not support Jacobs Wind's assertions.  Jacobs Delaware

was formed as a separate corporation from Jacobs Wind in 1980.  The April 1980

Pre-Incorporation Agreement provided that Jacobs Wind would assign its trade

name, trademark, and design mark to Jacobs Delaware.  (Schultz Decl. [Doc. No.

45] Ex. 4.)  Further, it was Jacobs Delaware - not Jacobs Wind - that applied for

the JACOBS mark ('629 Registration).  (<u>Id.</u>, Ex. 2.)  Thereafter, Jacobs

Delaware/EESI assigned all right, title and interest in the JACOBS mark to Wind

Turbine.  (<u>Id.</u>, Ex. 9 (December 15, 1986 Agreement, Ex. B).)  The fact that EESI

was granted back a license to use the JACOBS mark for use in connection with

wind farms further supports Wind Turbine's position that it was assigned all

rights, title and interest in the JACOBS mark.  (Id.)   Further, Wind Turbine has

detailed its continuous use of the JACOBS mark since 1986, and Jacobs Wind has

admitted that it was under a non-compete as of 1986.  (Schultz Decl. [Doc. No. 77]

Ex. B (Paul Jacobs Dep. at 223).)

The Court further finds that the assignment was not "in gross."  The law

provides that a valid transfer of a mark requires that the goodwill associated with

the mark also be transferred.  Visa, U.S.A. v. Birmingham Trust Nat. Bank, 696

F.2d 1371, 1375 (Fed. Cir. 1982).

> The rationale for the prohibition against a naked assignment of the mark
> without the accompanying goodwill stems from the nature of trademarks
> themselves.  They identify the source of the goods and services offered.  A
> key objective of the law of trademarks is protection of the consumer
> against being misled or confused as to the source of the goods or services
> he acquires.  The rule against assignment of a mark in gross thus reflects
> "the need, if consumers are not to be misled from established associations
> with the mark, that it continue to be associated with the same or similar
> products after the assignment."

Id. (citation omitted).  Here, the assignment of the JACOBS mark to Wind

Turbine included an assignment of the "goodwill associated therewith".  (Schultz

Decl. [Doc. No. 45] Ex. 9 (December 15, 1986 Agreement, Ex. B).)  The assignment

also included a license back to EESI for use in connection with wind farms.  Such

a license is valid if such license "provides for adequate control by the licensor

over the quality of goods or services produced under the mark by a licensee . . .

The purpose of such a requirement is to protect the public from being misled."

Id.  Again, the language of the assignment provided that Wind Turbine agreed

to "exercise reasonable supervision of the quality of said Goods . . ."  (Id.)  In

addition, Wind Turbine asserts that it was familiar with the quality of wind

turbines EESI had put into the wind farms, and that there was no need to

continually monitor EESI.  Further, EESI ceased operations in 1988, and Wind

Turbine was thereafter the only entity using the JACOBS mark.  (Chad Decl., Ex.

A at 51-54).)  Where the licensor is well-acquainted with the services provided by

the licensee, no danger is presented to the public and the license may be deemed

valid.  See, Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East, 542

F.2d 1053, 1059 (9th Cir. 1976).  See also, Glow Indus., Inc. v. Lopez, 273 F.

Supp.2d 1095, 1110-11 (C.D. Cal. 2003) (finding that where the contract provides

that licensee would continue to use mark in the same manner as he had

previously and that he would maintain quality standards, assignment was

deemed valid).  Because the assignment at issue provided that Wind Turbine

would exercise reasonable supervision of the quality of goods sold by EESI, and

because EESI's use of the JACOBS mark would be a continuance of its previous

use, the Court finds that the assignment of the JACOBS mark to Wind Turbine in

1986 is valid[1].

The Court finds that Jacobs Wind has not met its burden of demonstrating

the existence of genuine issues of material fact as to whether Wind Turbine has

continuously used the JACOBS mark since 1979, which is the date of first use

listed in the '629 Registration.  The Court thus concludes that Wind Turbine has

priority to use the JACOBS mark over Jacobs Wind.

### B.    Abandonment

A registered trademark may be cancelled if it has been abandoned.  15

U.S.C. § 1064(3). Wind Turbine asserts it is entitled to summary judgment as to its

request in Claim 2 to cancel the '714 Registration, and refuse registration of the

'473 Application, because Jacobs Wind abandoned its use of JACOBS, JACOBS

---

[1]The Court has also reviewed, and rejects, Jacobs Wind's additional arguments that 1) Jacobs Wind retained its rights to the goodwill and reputation in the Jacobs name in the wind energy business and to use the marks in the wind energy industry; 2) an anti-assignment clause in the Professional Services prevented EESI from assigning the mark to another entity without Jacobs Wind's approval; and 3) that EESI had no goodwill left to assign because it ceased the business of selling wind energy systems.

WIND ENERGY SYSTEMS and whale tail design in connection with the

manufacture and sale of wind energy equipment over thirty years ago.

To show that a mark has been abandoned, there must be evidence that the

use of the mark has been discontinued with the intent not to resume use.  15

U.S.C. § 1127; On-line Careline, Inc. v. America Online, Inc., 229 F.3d 1080, 1087

(Fed. Cir. 2000).  Generally, abandonment is a question of fact.  Id.

> The party seeking cancellation establishes a prima facie case of
> abandonment by showing proof of nonuse for three consecutive years.  See
> 15 U.S.C. § 1127.  Establishing a prima facie case "eliminates the
> challenger's burden to establish the intent element of abandonment as an
> initial part of [his] case," creating a rebuttable presumption that the
> trademark owner has abandoned the mark without intent to resume use.
> Id.  The burden then shifts to the trademark owner to produce evidence
> that he either used the mark during the statutory period or intended to
> resume use.  See id. "The burden of persuasion, however, always remains
> with the petitioner to prove abandonment by a preponderance of the
> evidence."  Id.

Id.

## 1.    Discontinued Use

The sale of a business, together with the trademark associated with the

business, constitutes discontinuance of the mark.  Vais Arms, Inc. v. Vais, 383

F.3d 287, 293 (5th Cir. 2005).  In addition, use of a mark on products or services

not listed in the registration does not constitute a trademark use to overcome

abandonment.  Emergency One, Inc. v. Am. FireEagle, Ltd., 228 F.3d 531, 536-37

(4th Cir. 2000).  Furthermore, "neither promotional use of the mark on goods in a

different course of trade nor mere token use constitute 'use' under the Lanham

Act."  Id.

The '714 Registration provides for the whale tail-fin design as used in

connection with "wind energy conversion apparatus comprising wind-driven

generators for electrical and mechanical power generation and parts thereof

mounted upon metal towers and the like" and claims first use in 1940.  (Schultz

Decl.[Doc. No. 45], Ex. 15.)  The '473 Application for the JACOBS mark covers

"Wind energy conversation [sp] apparatus comprising wind-powered electricity

generators and related parts thereof for use in electrical and mechanical power

generation" and claims first use in January 01, 1925.  (Id., Ex. 16.)  Wind Turbine

asserts that it has established a prima facie case of abandonment as Jacobs Wind

ceased using JACOBS as well as the whale tail design on wind energy products

when it sold the business to Jacobs Delaware in 1980.  Further, Paul Jacobs

admitted that Jacobs Wind was subject to a non-compete from 1980 to 1988.

(Schultz Decl. [Doc. No. 77] Ex. B (Paul Jacobs Dep. at 196-197).)  In fact, Jacobs

admitted that Jacobs Wind has not manufactured the tail fins or manufactured

any new wind energy systems in the last thirty years.  (Id., Ex. E (Paul Jacobs

Dep. at 30-31, 35, 45, 64, 171-72).)  Instead, Jacobs Wind engaged in the business

of remanufacturing products that had already been sold.  (Id. at 56.)

Jacobs Wind argues it has not abandoned any of the marks at issue because

any sales by Jacobs Delaware/EESI, including sales by Wind Turbine, inured to

the benefit of Jacobs Wind.  This argument is premised on its position that Jacobs

Wind is a partner in the joint venture which created Jacobs Delaware/EESI, and

that therefore Jacobs Wind is the registrant/owner of the JACOBS mark.

As discussed above, however, Jacobs Delaware was formed as a

corporation separate and apart from Jacobs Wind.  The law provides that

"[w]here a registered mark or a mark sought to be registered is or may be used

legitimately by related companies, such use shall inure to the benefit of the

registrant or applicant for registration . . . " 15 U.S.C. § 1055.  Here, Jacobs

Delaware was the registrant for the JACOBS mark.  Therefore, any use of the

JACOBS mark by Jacobs Wind would inure to Jacobs Delaware, not the other

way around.  Because Wind Turbine was thereafter assigned all rights to the

JACOBS mark by Jacobs Delaware/EESI, any use by Jacobs Wind of such mark

would inure to Wind Turbine.

Jacobs Wind nonetheless argues that it was involved in limited sales of wind energy equipment and services and that it has continuously used the marks in its letterhead and advertising since the 1930s and now on its website.  (Paul Jacobs Decl. [Doc. No. 95] ¶ 29, Ex. 5.)  Jacobs Wind further asserts that it reported income from wind energy products and services for most years since 1980.  In support, Jacobs Wind has submitted evidence of a sale of 12 crated systems in May 1992.  (Id. ¶¶ 26-27, Ex. 3.)  These sales  appear to be a resale of twelve unopened crated systems that Jacobs Wind obtained in 1988.  (Id. Ex. 3 at p. 9.)  In 2007, Paul Jacobs, through the Rural Energy Producers Electric Power Cooperative ("REPCO"), sold a remanufactured Jacobs Wind Energy Systems Model 31-20, 20 kw system. (Id. ¶ 28, Ex. 4.)

Jacobs Wind asserts that there is a legitimate reason for its comparatively limited sales - market conditions.  Jacobs Wind asserts that the market conditions for wind energy systems is cyclical, depending on the price of oil or other energy incentives provided by the government.  (Id. ¶ 29.)  Such conditions also account for Wind Turbine's relatively poor sales during 1988-2003.  (Schultz Decl. [Doc. No. 77] Ex. C (showing 75 sales between 1988-2003, and 215 sales as of 2003).)

The Court finds that Jacobs Wind has failed to put forth evidence to

24

establish genuine issues of material fact of continued use of the marks at issue.

There is no dispute that Jacobs Wind did not manufacture and sell any new wind

energy systems or the tail fins within the last thirty years.  While there is

evidence of the resale of twelve unopened crated systems in 1992 and one a

remanufactured system in 2007, there is no evidence that Jacobs Wind marked

such recycled products with the JACOBS mark for the first time.  The law

provides that such sales are insufficient to overcome the statutory presumption

of abandonment.  Coup v. Vornado Inc., 9 U.S.P.Q.2d 1824, (P.T.O. T.T.A.B. 1988)

("One who does not manufacture an article, but merely maintains and sells an

inventory of goods previously produced by an original manufacturer which has

abandoned the mark, establishes no rights in the mark.")  See also, Emergency

One, 228 F.3d at 356 (finding that sale of only one recycled truck not sufficient to

establish continued use); Exxon Corp. v. Humble Exploration Corp., 695 F.2d 96,

99 (5th Cir. 1983) (finding that a few isolated sales and invoices not sufficient to

overcome presumption of abandonment); La Societe Anonyme des Parfums le

Galion v. Jean Patou, Inc., 495 F.2d 1265, 1272 (2d Cir. 1974) (finding that 89 sales

in 20 years did not constitute use necessary to confer trademark rights).  Further,

Jacobs Wind's use of the marks on letterhead, divorced from the sale of a

product, does not establish use for purposes of determining abandonment.  S

Indus., Inc. v. Diamond Multimedia Sys., Inc., 991 F. Supp. 1012, 1019 (N.D. Ill.

1998) (finding that mere advertisements or documentary use do not constitute

trademark use).

Furthermore, the Court notes that reliance on a market realities doctrine

requires that Jacobs Wind demonstrate that it resumed using the mark in

commerce as soon as the external cause of nonuse has passed.  3 J. Thomas

McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17.16 (4th ed.)  Paul

Jacobs testified that demand for wind energy systems has risen substantially

since 2005.  (Paul Jacobs Decl. [Doc. No. 95] ¶ 29.)  In fact, Wind Turbine has

submitted evidence that it completed 215 sales of wind energy systems since

2003.  (Schultz Decl. [Doc. No. 77] Ex. C.)  By contrast, Jacobs Wind has submitted

evidence of only one sale since 2005.  Accordingly, the Court finds there is no

genuine issue of material fact that Jacobs Wind continued to use the marks at

issue.

## 2.    Intent to Resume Use

An intent not to resume use of a trademark may be inferred from the

circumstances.  15 U.S.C. § 1127 (defining "abandoned").  To show an intent to

26

resume use, Jacobs Wind would have to produce evidence of an intent to resume

use within the reasonably foreseeable future.  <u>Emergency One</u>, 228 F.3d at 537.

Jacobs Wind asserts that it made continuous efforts to resume use of its

trademarks in commerce, starting with its attempts in 1986 and 1988 to enter into

a joint venture with Wind Turbine.  (Jacobs Decl. [Doc. No. 95] ¶ 29; Ex. 5.)

As discussed above, however, the record is clear that Jacobs Wind has not

produced or sold a new wind energy system or whale tail-fin for approximately

thirty years.  With respect to the whale tail-fin covered in the '714 Registration,

Paul Jacobs testified that the last whale tail-fin was manufactured in 1979.

(Schultz Decl. [Doc. No. 77] Ex. E (Paul Jacobs Dep. at 35).)  He further testified

that he obtained the  '714 Registration in 1988 to simply reserve the mark for a

future date.  (<u>Id.</u> at 171.)  A company cannot, however, reserve a mark simply to

preclude competition or for later use.  <u>Lucent Info. Mgmt., Inc. v. Lucent Techs.,</u>

<u>Inc.</u>, 186 F.3d 311, 323, n.3 (3d Cir. 1999) (citing 15 U.S.C. § 1127).

Based on the above, the Court finds that there is no genuine issue of

material fact supporting Jacobs Wind's assertions that it continued to use the

marks in question and that it produced evidence of an intent to resume use in the

reasonably foreseeable future.   Wind Turbine is entitled to summary judgment

as to its claim that Jacobs Wind abandoned the marks at issue.

### 3.      Cancellation of the '714 Registration

Because there is no fact issue precluding a finding that Jacobs Wind

abandoned the whale tail-fin design covered in the '714 Registration in the years

before and after such registration was issued, the Court will grant Wind

Turbine's request to cancel the '714 Registration.

### 4.      Order to PTO to Refuse Registration of the '473 Application

The '473 Application seeks registration of the JACOBS mark.  In order to

obtain a trademark registration, the registrant must verify that the mark is in use

by the registrant, and that no other person was using the mark, or had the right

to use the mark in commerce.  15 U.S.C. § 1051(a)(3)(C) and (D).  As set forth

above, however, Jacobs Wind cannot verify that it was using the JACOBS mark in

the manner necessary to convey trademark rights.  In fact, Paul Jacobs admitted

in his deposition that Jacobs Florida has not used the JACOBS mark in connection

new wind energy systems as listed in the '473 Application for over twenty years.

(Schultz Decl. [Doc. No. 77], Ex. E (Paul Jacobs Dep. at 30-31, 64).)  A party is not

entitled to trademark registration absent bona fide use of the mark prior to

registration.  <u>Horany v. Hays</u>, 176 U.S.P.Q. 316, 320 (T.T.A.B. 1972).  Furthermore,

Wind Turbine has established that it has priority over Jacobs Wind with regard to the JACOBS mark.

Because Jacobs Wind cannot establish a right to register the JACOBS mark pursuant to 15 U.S.C. § 1051(a), Wind Turbine asks that the Court grant its motion to order the PTO to refuse the '473 Application.  Wind Turbine asserts that this Court has the authority to order such relief pursuant to 15 U.S.C. § 1119, which provides that the Court may "determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."

While the Eighth Circuit has not specifically addressed the issue of whether the Court has jurisdiction to order such relief, other courts have found that § 1119 should be read broadly to grant such relief, when the registerability of the mark involved in the application is intertwined with existing registrations. See, e.g., Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 614-15 (2d Cir.) cert. denied 364 U.S. 909 (1960); (court has authority to review initial registerability of trademark where such determination is tied directly to an existing registration); Durox Co. v. Duron Paint Mfg. Co., Inc., 320 F.2d 882, 886-87 (4th Cir. 1963)

(finding that court has jurisdiction pursuant to 15 U.S.C. § 1119 to determine registerability of trademark application where a registered mark is involved in the application determination); <u>Forschner Group, Inc. v. B-Line A.G.</u> 943 F. Supp. 287, 289-90 (S.D.N.Y. 1996) (finding that court has jurisdiction to review registerability of a trademark application).   Because the '473 Application is tied directly to an existing registration, this Court finds that § 1119 provides it the requisite authority to grant Wind Turbine's request to order the PTO to refuse the '473 Application.

## V.      Jacobs Wind's Motion for Summary Judgment

Jacobs Wind moves for summary judgment and asks the Court to: dismiss all claims asserted in the First Amended Complaint and quieting title to the surname "Jacobs" and the trademark "Jacobs Wind Energy Systems" and design in favor of Jacobs Wind; grant Jacobs Wind treble damages pursuant to 15 U.S.C. § 1117(b) and (c); and grant an injunction pursuant to the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1).

### A.      Wind Turbine's Claims

Jacobs Wind argues it is entitled to summary judgment as to the claims asserted in Wind Turbine's Complaint.  First, Jacobs Wind argues that Wind

Turbine did not acquire any common law rights or other rights to JACOBS from EESI.  As discussed above, however, the record is clear that Wind Turbine acquired all rights, title and interest in the JACOBS mark as set forth in the '629 Registration.

Jacobs Wind next argues that Wind Turbine cannot maintain a claim against Jacobs Wind for alleged fraud on the PTO where Wind Turbine also defrauded the PTO in applying for the JACOBS mark in 2007.  This argument of unclean hands is premised on Jacobs Wind's "joint venture" argument, and that Wind Turbine represented that the JACOBS mark was first used in June 1979.  (Kingstad Decl., Ex. 5.)  In addition, Jacobs Wind asserts that Wind Turbine supported the application with a photograph imitating or copying Jacobs Wind's trademarked "wind turbine design" which consists of a three blade generator with a whale tailfin covered in the '282 Registration.  (Id.)   Further, Wind Turbine's President, Archie Pavek, was well aware that such design was used by the Jacobs in the formation of the joint venture with CDCC, and claimed a first use date of June 1979.  As of that date, however, the only first use would have been by the Jacobs doing business as Jacobs Wind Electric Co.

Jacobs Wind further asserts that pursuant to the law applicable to the use

of a person's surname as a trade-name, a second-comer who also wishes to use the name must explain to the public that they are not associated with the senior or prior user.  Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 208 U.S. 554, 559 (1908).  Wind Turbine has never explained to the public or the PTO that it was not connected to the historical works and materials of the Jacobs.  Wind Turbine's continued attempt to portray itself as the successor to the Jacobs and Jacobs Wind and to falsely suggest its connection to the Jacobs and Jacobs Wind constitutes misappropriation and infringement.  15 U.S.C. § 1052 (a) and (c).

The doctrine of unclean hands will be invoked only to deny equitable relief to a party whose conduct has been unconscionable by reason of a bad motive.  Foy v. Klapmeier, 992 F.2d 774, 779 (8th Cir. 1993); Eckart v. Engelking Corp., No. A05-2241, 2006 Minn. App. LEXIS 1098, at *16 (Minn. Ct. App. Sept. 26, 2006).  Here, Jacobs Wind's unclean hands doctrine is again premised on its unfounded position that Wind Turbine never acquired any rights to the JACOBS mark.  The record clearly demonstrates, however, that Wind Turbine purchased and was assigned all rights, title and interest in the JACOBS mark in 1986.  Once a party transfers its rights to a mark, even if a surname, that company gives up its rights to the mark.  Kemp v. Bumble Bee Seafoods, Inc., 398 F.3d 1049, 1058 (8th Cir.

2005); <u>Vais Arms, Inc.</u>, 383 F.3d at 292.  As Jacobs Wind has admitted, the

JACOBS mark references a historical figure in the wind energy business.  A term

with surname significance may not be primarily a surname if that term also

identifies a historical place or person.  <u>Lucien Piccard Watch Corp. v. Since 1868</u>

<u>Crescent Corp.</u>, 314 F. Supp. 329, 334-35 (S.D.N.Y. 1970).

Finally, Wind Turbine asserts that it appropriately asserted a June 1979

first use date in its trademark application.  A party's interest in a trademark may

be derived from a predecessor in interest.  <u>Conagra, Inc. v. Singleton</u>, 743 F.2d

1508, 1511 (11th Cir. 1984).  When Jacobs Delaware originally applied for the

JACOBS mark, that application claimed a first use date of June 1979.  That

application matured into the '629 Registration for the JACOBS mark.  Wind

Turbine acquired the mark from EESI through assignment.  The assignment was

filed with the PTO, and signed by Jacobs Wind's counsel.  The '629 Registration

was inadvertently cancelled because Wind Turbine did not file the proper

paperwork.  In 2007, Wind Turbine filed a new application with the same scope

as set forth in the '629 Registration.  There was nothing inappropriate about

referencing the same scope.  At a minimum, there is a genuine issue of material

fact as to Wind Turbine's state of mind when the application was filed in 2007.

Based on the above, the Court finds that Jacobs Wind has failed to establish that it is entitled to summary judgment as to the claims asserted in Wind Turbine's Complaint.

## B.   Jacobs Wind's Counterclaims

### 1.   Treble Damages

The Lanham Act provides for treble damages for use of a counterfeit mark. In assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title or section 220506 of Title 36, in a case involving use of a counterfeit mark or designation (as defined in section 1116(d) of this title), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of

> (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services; or

> (2) providing goods or services necessary to the commission of a violation specified in paragraph (1), with the intent that the recipient of the goods or services would put the goods or services to use in committing the violation.

In such a case, the court may award prejudgment interest on such amount at an annual interest rate established under section 6621(a)(2) of Title 26, beginning on the date of the service of the claimant's pleadings setting forth the claim for such entry of judgment and ending on the date such entry is made, or for such shorter time as the court considers appropriate.

15 U.S.C. § 1117(b).

A counterfeit "is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Jacobs Wind asserts that it is entitled to treble damages under the Lanham Act as Wind Turbine has been engaged in the willful counterfeiting of "Jacobs Wind Energy Systems." Jacobs Wind asserts that since 1987, Wind Turbine has been marketing itself as the successor to the "Jacobs" name and goodwill to capitalize on the name and reputation of M.L. Jacobs and Jacobs Wind in the history of the wind energy industry, as well as his reputation and prestige as an inventor of wind turbine energy systems. For example, in a public announcement in 1987, Wind Turbine announced that it had purchased the Jacobs rights from EESI, and implied that it was the new "Jacobs Wind." (Paul Jacobs Decl. [Doc. No. 83] ¶ 62, Ex. 27.) Further, Wind Turbine's letterhead placed the surname "Jacobs" above its name "Wind Turbine Industries Corporation" as if to be read together. (Id.) In 1988, Wind Turbine, through its attorney, promised that it would cease and desist, that it would take steps to make clear that it was not associated with or a successor to Jacobs Wind and that it was unaware that anyone with Wind Turbine was "representing anything more than the fact that we are a supplier of

parts and new machines acquired from EESI, the purchase of the Jacobs' rights as we understand them to be." (Id. ¶ 66, Ex. 31)  Wind Turbine's subsequent submission of new letterhead is consistent with this representation - showing that Wind Turbine was only a dealer of "Jacobs" parts and equipment.

In 2007, however, Jacobs Wind learned that Wind Turbine allegedly continued to use Jacobs Wind's trademarks, such as its design mark (the '282 Registration) and Jacobs Wind's MASTERMIND mark.  Paul Jacobs allegedly learned from a Wind Turbine sales manager that Wind Turbine was still misrepresenting itself to the public on the internet as the "Jacobs company" or a successor to the Jacobs and Jacobs Wind.  (Paul Jacobs Decl. [Doc. No. 83], Exs. 34 and 35.)  A former Wind Turbine general manager had in his possession a business card showing the wind turbine logo covered by the '282 Registration. (Kingstad Decl. [Doc. No. 85], Ex. 4.)   Further, Wind Turbine used "Jacobs Wind Energy Systems" on its webpage, which Jacobs Wind argues is substantially indistinguishable from "Jacobs Wind Electric Company."  (Kingstad Decl. [Doc. No. 85], Ex. 2.)

Wind Turbine responds that a party asserting counterfeiting must prove that its mark was registered on the principal register for the particular goods and

services at issue and that the registered mark was in use.  15 U.S.C. §

1116(d)(1)(B)(I).  A party is not liable for counterfeiting any mark "used on or in

connection with good or services of which the manufacturer or producer was, at

the time of the manufacture or production in question authorized to use the mark

or designation for the type of goods or services so manufactured or produced."

15 U.S.C. § 116(d)(1)(B)(ii).

To the extent that Jacobs Wind asserts that Wind Turbine counterfeited the

mark covered in the '714 Registration, summary judgment must be denied where

the validity of such registration is at issue.  Further, Wind Turbine asserts that it

owns the JACOBS mark, and "Wind Energy System" is generic. (Paul Jacobs

Decl. [Doc. No. 83], Ex. 32 at 3.)  Liability for counterfeiting cannot be based on a

generic term.  Van Well Nursery, Inc. v. Money Life Ins. Co., 421 F. Supp. 2d

1321, 1332, 1335 (E.D. Wash. 2006).

With respect to the MASTERMIND mark, such mark was not registered

until 2008.  Jacobs Wind has presented no evidence that Wind Turbine used said

mark in any materials after the date of registration.  Further, Jacobs Wind does

not dispute that Wind Turbine had the right to sell products it acquired from

EESI.  Jacobs Winds admits that Wind Turbine has the right to the use the mark

in connection with products it acquired from EESI.  (Schultz Decl. [Doc. No. 77] Ex. C at 248-49.)

With respect to the design mark covered by the '282 Registration, there is no evidence such mark was counterfeited.  In fact, the design Jacobs Wind accuses Wind Turbine of counterfeiting includes a specific reference to "WTIC", which clearly differentiates the design from that covered in the '282 Registration. (Kingstad Decl. Ex. 3; Schultz Decl. Ex. F at 298.)

Based on the above, the Court finds that Wind Turbine has demonstrated genuine issues of material fact preclude summary judgment with respect to Jacobs Wind's claim for treble damages.

### C.    Cybersquatting

Jacobs Wind also seeks to enjoin Wind Turbine's use of "jacobswind.com." Jacobs Wind asserts that Wind Turbine selected this domain name after learning that Paul Jacobs was claiming that he owned the trademark rights to the JACOBS mark, making such selection deliberate and willful.  The Anticybersquatting Consumer Protection Act (ACPA) 15 U.S.C. § 1125(d)(1) was enacted to curb the proliferation of cyberquatting, and provides that a person will be liable to the owner of a mark, where the use of such mark is in bad faith with the intent to

profit from such mark, and uses a domain name that is identical or confusingly similar to the mark.  15 U.S.C. § 1125(d)(1)(A).  Jacobs Wind asserts that Wind Turbine's website and the use of "jacobswind.com" is virtually identical to its domain name "jacobswind.net."

Wind Turbine responds that this claim has no merit as Wind Turbine owns the JACOBS mark and had reasonable grounds to believe that the use of the domain name "jacobswind.com" was a fair use.  To find Wind Turbine liable under the ACPA, the Court must find Wind Turbine acted in bad faith.  Jet Works Air Ctr. Mgmt. L.L.C. v. Jetworks Int'l, Inc., No. C-09-1395, 2009 U.S. Dist. LEXIS 85746, at *3-4 (N.D. Cal. Sept. 2, 2009).  Wind Turbine acquired the entire rights to the JACOBS mark in 1986, and has been using the mark in connection with wind energy equipment since that time.  Wind Turbine asserts that it therefore had a right to use the "jacobswind.com" domain name because it holds the JACOBS mark.

Wind Turbine further asserts there is no evidence that it intended to divert traffic from Jacobs Wind.  The use of the domain name to point to Wind Turbine's website is also appropriate.  Rather than maintain two websites, Wind Turbine maintains one, and forwards "jacobswind.com" to the Wind Turbine

site, where it offers for sale the Jacobs' products.

Wind Turbine further asserts that there is no evidence it offered to transfer, sell or otherwise assign the domain name to a third party, nor has Wind Turbine registered for multiple domain names that are confusingly similar.  Finally, Sunday's Energy, Inc., a web hosting company, registered and maintains the "jacobswind.com" domain name on behalf of Wind Turbine.  This is not evidence of providing material or misleading contact information.

Based on the above, the Court finds that Wind Turbine has demonstrated, at a minimum, that genuine issues of material fact preclude summary judgment in favor of Jacobs Wind on its cybersquatting claim.

IT IS HEREBY ORDERED:

1.     That Plaintiff Wind Turbine's Motion for Partial Summary Judgment [Doc. No. 74] is GRANTED.  The Court hereby finds that: (1) Wind Turbine has priority over Jacobs Wind to use the mark JACOBS in connection with wind energy products, including the goods listed United States Trademark App. Ser. No. 77/586,056, namely wind electric power plants comprising wind powered electricity generators and related parts thereof; (2) Jacobs Wind has abandoned

the mark JACOBS WIND ENERGY SYSTEM (and design) as used in connection with the goods set forth in U.S. Trademark Reg. No. 1,532,714; and (3) Jacobs Wind has abandoned the mark JACOBS as used in connection with the goods set forth in U.S. Trademark App. No. 76/677,473. Based on these findings, the Court hereby directs the United States Patent and Trademark office to cancel U.S. Trademark Reg. No. 1,532,714 and to refuse registration to U.S. Trademark App. No. 76/677,473.

2.     Defendant Jacobs Wind's Motion for Summary Judgment [Doc. Nos. 79 and 90] is DENIED in its entirety.

Date: November 15, 2010


                                        s/ Michael J. Davis
                                        Michael J. Davis
                                        Chief Judge
                                        United States District Court